# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| I. KENNETH COOK, <u>et</u> <u>al.</u>, | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 7:12-cv-00455 |
| v. | ) | |
| | ) | <u>MEMORANDUM OPINION</u> |
| JOHN HANCOCK LIFE INSURANCE | ) | |
| COMPANY (U.S.A.), <u>et</u> <u>al.</u>, | ) | By: Hon. Michael F. Urbanski |
| | ) | United States District Judge |
| Defendants. | ) | |

Pending before the court are two motions to dismiss, both of which seek dismissal of all the claims against each moving defendant. They were filed by defendants John Hancock Life Insurance Company (U.S.A.) ("JHLIC"),[1] Dkt. No. 12, and Nationwide Insurance Company ("Nationwide"), Dkt. No. 18. Both motions have been fully briefed, and were argued before Senior United States District Judge James C. Turk on January 14, 2012. Shortly thereafter, the entire case was stayed to allow plaintiffs' claims against Crown Capital Securities, LP to be arbitrated. The two motions to dismiss were denied without prejudice in light of the stay. Dkt. Nos. 35, 42. After the stay was lifted on July 1, 2014, the case was transferred to the undersigned. The motions have been re-urged by the defendants, Dkt. No. 52, and are now ripe for disposition.

For the reasons set forth herein, the court will **GRANT IN PART** and **DENY IN PART** both motions.

---

[1] At JHLIC's request—and because plaintiffs have not objected—the court will order that the style of the case, which improperly names as a defendant "John Hancock Life Insurance Company" be amended to reflect the proper name of that entity, "John Hancock Life Insurance Company (U.S.A.)." <u>See</u> Dkt. No. 13 at n.1.

# I.

## A.

There are two named plaintiffs in this matter—Dr. I. Kenneth Cook ("Cook"), a retired physician and resident of Virginia, and the Kenneth Cook Irrevocable Insurance Trust, by its Trustee, Kenneth Todd Cook ("the Trust" and "the Trustee," respectively). The plaintiffs seek to hold the defendants liable for more than $1 million in financial damages they allegedly incurred, primarily as a result of alleged conduct by defendant Neil Copeland Winterrowd, who served for many years as Cook's investment adviser. The complaint alleges that the remaining defendants are liable in part because of their own alleged acts or omissions, but primarily because of their respective relationships with Winterrowd. The extent and nature of those relationships and, in particular, whether Winterrowd can be considered an "agent" of either JHLIC or Nationwide for purposes of liability in this case, are raised by the pending motions. The defendants also assert various other arguments in support of their motions to dismiss, as discussed below.

One of the defendants named in the complaint—Crown Capital Securities, LP—was dismissed from the case with prejudice after the arbitration concluded. Dkt. No. 52. In addition to Winterrowd (a California resident), there are three remaining defendants:

1. JHLIC, a Michigan corporation with its principal place of business in Massachusetts;
2. JP Turner & Co., LLC, a limited liability company whose two members were both Georgia residents at the time the complaint was filed; and
3. Nationwide, an Ohio corporation with its principal place of business in Ohio.[2]

Winterrowd worked as a Financial Industry Regulatory Authority ("FINRA")[3] registered

---

[2] Since both plaintiffs are Virginia residents, the parties are completely diverse. The amount in controversy exceeds $75,000 and thus this court has jurisdiction pursuant to 28 U.S.C. § 1332.

[3] FINRA, created in 2007, "is a registered, self-regulatory organization authorized under the Securities Exchange Act of 1934." Morgan Keegan & Co. v. Silverman, 706 F.3d 562, 563 & n.2 (4th Cir. 2013). It "has the authority to create and enforce rules for its members to provide 'regulatory oversight of all securities firms that do business with the public.'" Id. (citation omitted).

representative for Crown Capital from May 2004 to August 2009 and for JP Turner from August 2009 to September 2011.

As discussed in more detail below, JHLIC's connection to the case is based on the fact that Winterrowd recommended as an investment and sold Cook a $10 million life insurance policy from JHLIC in 2007 (while working for Crown), advice plaintiffs allege was both negligent and fraudulent. He then took additional steps related to that policy that plaintiffs contend also give rise liability on the part of JHLIC, including the alleged conversion of certain premiums Cook paid. Winterrowd also sold Cook a variable annuity from Nationwide and took certain actions related to that annuity that plaintiffs allege render Nationwide liable. The details of the alleged actions are described below.

As noted, JHLIC and Nationwide responded to the complaint by filing the pending motions to dismiss. J.P. Turner answered and filed a cross-claim for indemnity, contribution, and attorneys' fees and costs against Winterrowd, but did not file a motion to dismiss. Winterrowd was served, but has not answered or otherwise responded to the complaint.

**B.**

The court accepts the well-pled allegations of the complaint as true for purposes of ruling on the pending motions to dismiss. Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). As relevant to the motions here, the complaint alleges that Cook began receiving investment and insurance advice from Winterrowd in 1994. Dkt. No. 1 at ¶ 12. At the time, Winterrowd was a registered FINRA securities representative providing services through Smith Barney. From 1994 through the events described in the complaint, Winterrowd continued to act as a financial advisor to Cook and Cook's wife. For example, he provided investment and insurance advice, managed their investments, and sold various insurance and securities products to the Cooks.

In 2007, Winterrowd sold Cook a $10 million life insurance policy from JHLIC (the "JHLIC Policy"). Cook alleges that such a policy was "excessively large" and "far beyond the amount that

3

Cook thought he might need." Dkt. No. 1 at ¶ 15. The premium payments required were also high, e.g., the annual premium for the first year was $257,957.00. Id. at ¶ 16. Cook alleges that Winterrowd told him that he could borrow money for the premiums from a bank, if necessary. Id.

Despite his concerns over the policy amount and high premiums, Cook alleges he agreed to purchase such a large policy because Winterrowd advised him that it could be used as an investment and be sold after two years for a profit. In support of this representation, Winterrowd provided documents from an entity with which he was associated—Fairway Capital. The documents demonstrated how the policy could be sold in two years as a life settlement for a gain of almost one million dollars.[4] See Dkt. No. 1, Ex. 1. Fairway Capital was a California entity used by Winterrowd and Kevin Yurkus (the president of Fairway Capital), to sell investments. Dkt. No. 1 at ¶ 17. JHLIC paid a commission on the $10 million policy to Fairway, which Cook alleges was shared with Winterrowd. Id.

Winterrowd advised and facilitated the establishment of a living trust to be designated as the owner of the JHLIC Policy. Cook initially paid the premiums to the attorney who established the trust, Dimitri Reyzin, whose law firm was designated as its trustee. Winterrowd subsequently instructed Cook to pay the premiums directly to Winterrowd, which Cook did. Id. at ¶¶ 19-20. Winterrowd did not forward all of these payments to JHLIC and instead kept some of them. Reyzin did not keep Cook or the Trust's beneficiaries informed of the deficiencies in the premium payments and further failed to advise them of the lapse of the policy due to non-payment of the premiums. Id. at ¶ 20.

Winterrowd repeatedly represented to Cook that he was in the process of arranging for the sale of the JHLIC Policy, and even had Cook sign settlement papers in 2011. Dkt. No. 1 at ¶ 21.

---

[4] In general terms, a life settlement is a transaction where the owner of a life insurance policy sells the policy to a third party for an amount greater than the policy's cash surrender value but less than the expected payout to the beneficiary upon the policy owner's death. Michael G. Koutnik, Long Live Life Settlements: The Current Status and Proposed Direction of the Life Settlement Market, 96 Marq. L. Rev. 913, 915 (2013).

Cook further alleges that these representations were false and merely a part of Winterrowd's fraudulent scheme. The JHLIC Policy was never sold, and as noted, eventually lapsed for non-payment of premiums. Additionally, at some point Winterrowd withdrew $50,000 from one of Cook's Prudential variable annuities and had the check sent to JHLIC. JHLIC then returned the money by sending a check to "Annuity Investment Group"—a trade name used by Winterrowd—and Winterrowd then converted those funds for his personal use. Id. at ¶ 32.

In total, Cook asserts he lost approximately $1 million related to the JHLIC policy, which consists both of amounts paid to JHLIC for coverage while the policy was in effect, some premium payments allegedly converted by Winterrowd, and the $50,000 paid by JHLIC to Winterrowd.[5]

Cook also alleges Winterrowd, J.P. Turner, and Nationwide are liable for Winterrowd's actions in connection with an annuity contract issued by Nationwide. Nationwide issued the annuity contract—which Cook purchased through Winterrowd—in 2006. See Dkt. No. 18, at Ex. A. Cook does not allege any improprieties as to the sale or issuance of the annuity. Rather, he complains that in 2010, Winterrowd allegedly used Cook's signature from a different form to withdraw $150,000 from the Nationwide annuity—without Cook's permission—in order to pay the premium on the JHLIC Policy. Dkt. No. 1 at ¶¶ 24-26. Although Cook wired the funds back to Winterrowd so that Winterrowd could return them to the Nationwide annuity, Cook alleges Winterrowd converted those funds. Id. ¶ 27. Cook also incurred $14,239.93 in surrender charges assessed by Nationwide

---

[5] Plaintiffs itemize the total amount of damages sought ($1,141,966.93) as follows:
- $648,151 – premiums actually paid to and received by JHLIC (but not recouped due to lapse of the JHLIC Policy by reason of fraud);
- $279,576 – premiums for the JHLIC Policy sent by Cook to Winterrowd, but converted by Winterrowd;
- $164,239.93 – funds withdrawn without authorization from the Nationwide variable annuity and then converted by Winterrowd ($150,000) plus surrender charges ($14,239.93); and
- $50,000 – funds withdrawn from a Prudential annuity and sent to JHLIC, who then sent them to Winterrowd, who then converted them.

Dkt. No. 1 at ¶ 33.

5

for that withdrawal. Id. After Winterrowd had converted the funds, he continued to misrepresent to Cook that the transaction had been or would be reversed without financial consequences. Id. at ¶ 28. Winterrowd also had Cook sign a letter drafted by Winterrowd (on letterhead for "Legacy Insurance Partners") informing Nationwide that Cook "authorized" the return of the funds and "under[stood] and agree[d] this transaction will be treated retroactively as if the initial withdrawals never were initiated, and the market performance will be retroactive as well." Id. at ¶ 28 & Ex. 3. Nationwide has refused to reimburse Cook for any portion of the withdrawal or for the surrender charges. Id. at ¶ 29.

## C.

Plaintiffs' complaint contains five counts. With the exception of Count III, however, the counts do not differentiate between defendants, appearing instead to name all of the defendants. Count I is a claim for conversion. Count II alleges violations of the Virginia Securities Act, Va. Code §§ 13.1-502 and 13.1-522, Section 10(b) of the Federal Securities Exchange Act of 1934, and also asserts claims for common law fraud and constructive fraud. Count III names all the defendants except Winterrowd and alleges that they were negligent for failing to prevent Winterrowd's conversion of funds, for failing to adequately supervise Winterrowd, and for negligently breaching independent duties owed to plaintiffs. Count IV alleges defendants breached fiduciary duties owed to the plaintiffs arising out of defendants' role as investment, securities, and insurance professionals. In Count V, plaintiffs allege defendants breached express and implied contracts.

## II.

Rule 12(b)(6) of the Federal Rules of Civil Procedure directs dismissal when a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the plaintiff's allegations must "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "It requires the plaintiff to articulate facts, when accepted as true,

6

that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 678).

Where a federal court's jurisdiction is based on diversity, it must apply the forum state's substantive law, including its choice-of-law rules. Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). For tort claims, Virginia applies the rule of lex loci delicti, Jones v. R.S. Jones & Assocs., Inc., 246 Va. 3, 5, 431 S.E.2d 33, 34 (1993), which requires the court to apply the law of the state where the last event necessary to make an actor liable takes place. Quillen v. Int'l Playtex, Inc., 789 F.2d 1041, 1044 (4th Cir. 1986). In this case, the last act necessary for each of the claims asserted is the resulting damages to the plaintiffs, which loss was sustained by them in Virginia. See, e.g., St. Paul Fire & Marine Ins. Co. v. Hoskins, 2012 WL 748574, at *4 (W.D. Va. Mar. 7, 2012) (applying Virginia law to claims of breach of fiduciary duty, common law conspiracy, and related claims because Virginia was where the loss was sustained by the plaintiff). Accordingly—and as the parties do in their respective filings—the court applies Virginia substantive law to plaintiffs' tort claims.

As to the law to be applied to plaintiffs' breach of contract claims, the JHLIC policy expressly states that it shall "be governed by and construed according to the laws of Virginia." Dkt. No. 13-1 at 23. Thus, a claim based on any breach of that policy would be governed by Virginia law. Likewise, the Nationwide annuity appears to be a Virginia-specific form and—although no party has identified a choice-of-law provision in that policy and the court has not found one—the annuity references Virginia law on the front page. See Dkt. No. 18-1 at 1. Additionally, "Virginia adheres to the principle that the law of the place of performance governs questions arising in connection with the performance of a contract." Equitable Trust Co. v. Bratwursthaus Mgmt. Corp., 514 F.2d 565, 567 (4th Cir. 1975) (citing Arkla Lumber & Mfg. Co. v. W. Va. Timber Co., 146 Va. 641, 132 S.E.

7

840, 842 (1926)). Here, the place of performance for both the JHLIC Policy and the Nationwide annuity was Virginia, since that is where Cook (the insured under the JHLIC Policy) lived and where payments would be made to him under the Nationwide annuity. For all these reasons, the court concludes that Virginia law governs the breach of contract claims.

## III.

### A. JHLIC'S Motion to Dismiss

The court first addresses JHLIC's motion to dismiss, which is premised on several different grounds. JHLIC first claims that the Trust cannot bring claims in its own name and argues that all of its claims must be dismissed for lack of standing.[6] Second, JHLIC claims that plaintiffs fail to state a claim against it because plaintiffs' claims are dependent upon Winterrowd being an agent of JHLIC and the facts do not sufficiently allege an agency relationship. Third, JHLIC contends that each of the individual counts is subject to dismissal for other reasons, in addition to the lack of agency.

### 1. Standing of the Trust

JHLIC's first argument is that the trust lacks standing to bring any claims in this action. Dkt. No. 14 (objection on standing grounds); Dkt. No. 13 at 5. In response to this argument, plaintiffs ask that, to the extent there are any errors in the way the complaint is styled, they should be granted leave to amend to name the party as "Kenneth Todd Cook, as Trustee of the Trust." Dkt. No. 20 at 3-4. In JHLIC's reply, it contends that plaintiffs' response shows they misunderstand the nature of the standing argument. Dkt. No. 26 at 2 n.2. It argues that the only proper plaintiff is "Kenneth Todd Cook, Trustee of the Kenneth Cook Irrevocable Insurance Trust." Id.

JHLIC relies heavily on Rule 17(a)(1)(E) of the Federal Rules of Civil Procedure to support

---

[6] JHLIC has filed a separate objection on this ground, as well, pursuant to Rule 17(a)(1)(E). See Dkt. No. 14.

its argument.[7] The proper starting point for court's analysis, however, is Rule 17(b), which directs that the determination of whether a trust has the capacity to sue or be sued is governed by the law of the state where the court is located (here, Virginia). Fed. R. Civ. P. 17(b); see Blick v. Soundview Home Loan Trust 2006-WF1, 2013 WL 139191, at *3 (W.D. Va. Jan. 10, 2013). "Under Virginia law, '[u]nless a statute expressly provides otherwise, a trust as such cannot sue or be sued; actions must be brought by or against the trustees.'" Id. at *3 (quoting 1-5 Sinclair & Middleditch, Virginia Civil Procedure § 5.10 (5th ed. 2008) (citation omitted)); see also Dkt. No. 26 at 1-2 (JHLIC's reply citing authority for the proposition that the Trust, as an entity, has no capacity to sue or be sued, including Limouze v. M.M. & P. Mar. Advancement, Training, Educ. & Safety Program, 397 F. Supp. 784, 789 (D. Md. 1975), Yonce v. Miners Mem'l Hosp. Ass'n, 161 F. Supp. 178, 188 (W.D. Va. 1958), and Carpenters & Millwrights Health Benefit Trust Fund v. Domestic Insulation Co., 387 F. Supp. 144, 147 (D. Colo. 1975)).

JHLIC is thus correct that the Trust may not sue in its own name. Instead, it can sue only through its trustee. Accordingly, the second plaintiff should be "Kenneth Todd Cook, Trustee of the Kenneth Cook Irrevocable Insurance Trust." See Dkt. No. 26 at 2 n.2 (JHLIC noting the same, although omitting "Todd"). Despite the misnomer in the complaint, the court declines JHLIC's invitation to dismiss all claims by this plaintiff for lack of standing, particularly since plaintiffs have moved to amend the name of the party to comport with whatever the court determines is proper. See Dkt. No. 20 at 4.

While Virginia law governs the capacity of a trust to sue, "substitution of a party appears to be a matter of procedure that should be governed by federal law." Blick, 2013 WL 139191, at *3

---

[7] Contrary to JHLIC's interpretation, this provision does not preclude a trust from being a named party. Cf. Fed. R. Civil. P. 17(a)(1)(E). Instead, it simply states: "An action must be prosecuted in the name of the real party in interest. The following may sue in their own names without joining the person for whose benefit the action is brought: . . . (E) a trustee of an express trust . . . ." In the court's view, the real party in interest in this case is the Trust, and the quoted provision simply says that a trustee "may" sue in his name without joining the trust. It does not say that a trust cannot be a party. Instead, the capacity to sue is governed by state law, as discussed herein.

(citing Erie R. Co., 304 U.S. 64). The amendment of pleadings is likewise a matter of procedure governed by federal law. See Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr. 594 F.3d 285, 293 n.1 (4th Cir. 2010) (citing Hogue v. Sam's Club, 114 F. Supp. 2d 389, [391] (D. Md. 2000)). In Blick, Judge Moon looked to Fed. R. Civ. P. 21, which allows a court to sua sponte, at any time, on just terms, add or drop a party, and further states that "[m]isjoinder of parties is not a ground for dismissing an action." Fed. R. Civ. P. 21. Similarly, Rule 17(a)(3) provides that "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to . . . be substituted into the action. After . . . substitution, the action proceeds as if it had been originally commenced by the real party in interest." Fed. R. Civ. P. 17(a)(3).

Consistent with Rules 17(a)(3) and Rule 21, the court will simply allow amendment and will substitute "Kenneth Todd Cook, Trustee of the Kenneth Cook Irrevocable Insurance Trust" as the second plaintiff. The style of the case shall be amended to reflect the change. To the extent JHLIC seeks dismissal of the claims brought by the now-substituted party based on a lack of standing, its motion will be denied.

## 2. Agency

JHLIC's next argument is that the complaint fails to allege facts to establish an agency relationship between Winterrowd and JHLIC and thus that JHLIC cannot be held vicariously liable for any of the acts Winterrowd committed. According to JHLIC, the lack of any facts to support an agency theory requires dismissal of all the claims against it except for the breach of contract claim.

In Virginia, "[u]nless the existence of an agency relationship depends upon unambiguous written documents, or undisputed facts, the question of agency vel non is one of fact for the jury." Drake v. Livesay, 231 Va. 117, 121, 341 S.E.2d 186, 189 (1986); Acordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P., 263 Va. 377, 384, 560 S.E.2d 246, 250 (2002) (same). Moreover, "[a]gency may

be inferred from the conduct of the parties and from the surrounding facts and circumstances."

Drake, 231 Va. at 121, 341 S.E.2d at 189. Thus, if plaintiff has alleged facts to support a plausible claim of agency, JHLIC's motion to dismiss on this ground must be denied.[8]

The court concludes that plaintiff has adequately pled Winterrowd was JHLIC's agent for purposes of selling the JHLIC policy and collecting premiums on it. This conclusion is based on several factors considered collectively: (1) the Virginia statute governing insurance agents renders it plausible that Winterrowd was JHLIC's agent; (2) the complaint adequately alleges that Winterrowd was a sub-agent of Yurkus, who was JHLIC's appointed producer and agent in Virginia to sell JHLIC life insurance policies; and (3) there are sufficient facts to plausibly show Winterrowd acted within the scope of his apparent authority.

The Virginia insurance statute on which plaintiffs rely—Virginia Code § 38.2-1801— provides:

> A. A licensed agent shall be held to be the agent of the insurer that issued the insurance sold, solicited, or negotiated by such agent in any controversy between the insured or his beneficiary and the insurer. No licensed agent or any other person shall claim to be a representative of, authorized agent of, agent of, or other term implying an appointed relationship with a particular insurer unless such agent has become an appointed agent of that insurer. For the purpose of notice of claim or suit, the agent or producer of record shall be deemed to be the agent of the insurer. In the case of policies of life insurance, accident and sickness insurance, annuities and

---

[8] The question of agency in this case is not straightforward because the alleged facts could plausibly support different conclusions as to Winterrowd's role at any given time. That is, Winterrowd had long been a financial advisor to Cook and thus at times clearly was acting as an agent for Cook. It is also alleged that he was employed by or working as an investment professional for other defendants at the time of these events (Crown and then J.P. Turner), and thus there may be an principal-agent relationship (or master-servant relationship) between Winterrowd and those entities. Furthermore, plaintiffs contend that he was also an agent for JHLIC and for Nationwide in taking some of the challenged actions. See generally Dkt. No. 20 at 4-12. Finally, his precise role in the insurance transactions is not easily discernable from the allegations in the complaint, which frequently claim he was an insurance "agent," but describe a role more akin to that of a broker. See Pacific Fire Ins. Co. v. Bowers, 163 Va. 349, 354-55, 175 S.E. 763, 765 (1934) (describing a broker as one who acts as a middleman between the insured and the insurer, and an agent as one who is commissioned and employed by the insurance company); see also Douglas R. Richmond, Insurance Agent and Broker Liability, 40 Tort Trial & Ins. Practice Law J. 1, 3-7 (2004) (discussing distinction between broker and agent, identifying various types of agents in the insurance business, and summarizing that "[a]gency relationships depend on facts, not labels").

variable annuities, such notice shall be given to the insurer at its home office as shown in the policy of insurance.

B. A premium payment made by an insured to an agent, whether appointed by an insurer or not, or to a surplus lines broker, where the insurer or its appointed agent acknowledged specific insurance for a specific policy period by the issuance of a policy, written binder, or other contract of temporary insurance, whether new or renewal, shall be considered payment to the insurer, and such insurer shall be liable to the insured for (i) any covered losses under the insurance and (ii) the return to the insured of any unearned premium amount due the insured except as provided in subsection D of § 38.2-1806.

Va. Code Ann. § 38.2-1801.

The plain language of the first sentence of Section A supports plaintiffs' view of the agency relationship here because some of Winterrowd's allegedly tortious conduct occurred during the sale or solicitation of the JHLIC Policy. That sentence states that "[a] licensed agent shall be held to be the agent of the insurer that issued the insurance sold, solicited, or negotiated by such agent in any controversy between the insured or his beneficiary and the insurer." Id. (emphasis added); see also Lott v. Scottsdale Ins. Co., 827 F. Supp. 2d 626, 636 (E.D. Va. 2011) ("A licensed agent shall be held to be the agent of the insurer that issued the insurance in any controversy between the insured and the insurer"; thus, the knowledge of the agents who sold or issued the policies was properly imputed to the insurer); Equitable Variable Life Ins. Co. v. Wood, 234 Va. 535, 539, 362 S.E.2d 741, 744 (1987) (notice of cancellation given to the soliciting agent constituted notice to the insurer and was effective to cancel the policy and entitle the policyholder to premium refunds, even though the policy and certain forms directed the policyholder to return the forms (or to cancel) via mailing direct notice to the insurer).

The Supreme Court of Virginia has applied this basic principle, even in cases where the "agent" is acting in a dual capacity and possibly an agent for both the insured and the insurer for different purposes. Specifically, in Maryland Cas. Co. v. Craig, 213 Va. 660, 194 S.E.2d 729 (1973),

12

the court rejected an attempt by an insurer to limit the scope of its agent's authority. There, the court concluded that while James Fauber acted as the plaintiff insured's agent in obtaining a loan to purchase property, Fauber acted as the insurer's agent in selling a fire insurance policy to plaintiff.[9] Id. at 663-64, 194 S.E.2d at 731-32. Accordingly, the Supreme Court affirmed the trial court's ruling that the insurer was bound by oral statements made by Fauber when the policy was sold and that Fauber's knowledge could be imputed to the insurer. Id. at 665, 194 S.E.2d at 733.

The alleged facts here are similar. In this case, the complaint alleges that Yurkus, the president of Fairway Capital, was JHLIC's licensed agent in Virginia. Dkt. No. 1 at ¶ 17 (at the time Winterrowd sold Cook the JHLIC Policy, JHLIC "had appointed Kevin Yurkus as a Producer and agent in Virginia to sell John Hancock life insurance"). The complaint further alleges that Winterrowd worked with or for Yurkus in selling the JHLIC policy to Cook. Id. ("Upon information and belief, Mr. Yurkus was the president of Fairway Capital at the time, an entity used for Mr. Yurkus and Mr. Winterrowd to sell life insurance and other investments from their office in California."). The same paragraph alleges that JHLIC paid commissions to Yurkus and/or Fairway Capital and that those commissions were shared with Winterrowd. Id. It is thus at least plausible, pursuant to Craig and Virginia Code § 38.2-1801, that JHLIC could be bound by Winterrowd's oral statements when the policy was sold.

JHLIC contends, however, that the complaint is devoid of any facts that Winterrowd was a licensed agent for it and instead that Kevin Yurkus of Fairway Capital is the individual who issued its policy and the person listed as JHLIC's agent on the policy. See Dkt. No. 1 at Ex. 1. Although it is true that the policy lists Yurkus as the issuing agent, the fact that Winterrowd is not the listed agent or that he was not the licensed agent for JHLIC is not dispositive on the issue of agency. Instead,

---

[9] The insurer admitted that W.J. Perry Corporation was its agent and that James Fauber "was a sub-agent of W.J. Perry Corp. authorized to solicit and submit to said W.J. Perry Corporation applications for insurance." 213 Va. at 662, 194 S.E.2d at 731.

13

the court concludes that a sub-agency theory could plausibly apply to the facts alleged in the complaint and render Winterrowd's JHLIC's agent for some purposes.

As the Supreme Court of Virginia has explained:

> Insurance companies know, or ought to know, when they appoint general agents, that, according to the ordinary course of business, they have clerks and other persons to assist them, and that their agents in many instances could not transact the business entrusted to them if they were required to give their personal attention to all of its details. It being necessary, therefore, and according to the usual course of business, for their agents to employ others to aid them in doing the work, it is just and reasonable that insurance companies should be held responsible not only for the acts of their agents but also for the acts of their agents' employees, within the scope of the agents' authority. Goode v. Georgia Home Ins. Co., 92 Va. 392, 23 S.E. 744, 745 [1895]; Northern Neck Mut. Fire Ass'n v. Turlington, 136 Va. 44, 116 S.E. 363 [1923]. This is doubly true when the agent is a corporation.
>
> The business of an insurance agent is generally of such nature and extent that it requires the employment of subagents and clerks if it is to be taken care of properly. Such subagents or clerks may be regarded as agents of the company by an insured dealing with them. . . .

Royal Indem. Co. v. Hook, 155 Va. 956, 967-68, 157 S.E. 414, 418 (1931) (citation and internal quotations omitted).

The complaint also alleges that Cook repeatedly sent premiums for the JHLIC policy to Winterrowd, only some of which were converted, and the remainder of which were applied to the policy. Id. at ¶ 20. JHLIC's receipt of premium payments from Winterrowd could further suggest that Winterrowd was acting in an agency capacity for JHLIC. In light of these allegations—and despite the fact that the complaint does not use the term "sub-agent"—the complaint states a plausible claim that Winterrowd was at least a sub-agent of JHLIC and acted on its behalf with regard to the sale of the JHLIC Policy to Cook and the collection of premiums for that policy. See generally Craig, supra; see also Sher v. Luxury Mortg. Corp., 2012 WL 5869303, at *11 (D. Md. Nov. 19, 2012) (denying motion to dismiss claim against insurance company premised on lack of agency

14

in case where subagent was alleged to have engaged in negligent or fraudulent misrepresentations). This is also consistent with Va. Code § 38.2-1801(B), which states that a premium payment to an agent or broker, "whether new or renewal, shall be considered payment to the insurer. . . ."

The court further concludes that the complaint has adequately alleged that the acts of Winterrowd here (as a sub-agent of Yurkus, JHLIC's licensed agent) were arguably within the scope of Winterrowd's actual or apparent authority. JHLIC repeatedly contends that the complaint does not allege that JHLIC did or said anything to clothe Winterrowd himself with authority and that this precludes any finding of agency. See Dkt. No. 13 at 3, 7. The complaint alleges, however, that Winterrowd was effectively a sub-agent for Yurkus, who in turn was an appointed agent for JHLIC in Virginia. Put differently, JHLIC clothed Yurkus (and thus his sub-agents like Winterrowd) with apparent authority to explain or sell policies of insurance and to collect premiums on its behalf. As noted by plaintiffs, JHLIC provided Yurkus and Winterrowd the proper applications and documents to purchase the policy, issued the policy in response to the documents submitted, and accepted more than six hundred thousand dollars in premiums prior to the policy's lapse, many of which Cook paid through Winterrowd. All of these actions by JHLIC could suggest to a third party that Winterrowd was its agent. At the very least, these facts are sufficient to survive a motion to dismiss on this issue. Dudley v. Estate Life Ins. Co. of Am., 220 Va. 343, 349-352, 257 S.E.2d 871, 875-77 (1979).

Dudley is particularly instructive. There, the court reversed the trial court's entry of judgment after trial in the insurer's favor where the trial court had concluded there was insufficient evidence to allow the agent's fraud to be imputed to the insurer. In explaining its decision to reverse, the Supreme Court of Virginia reasoned that there was sufficient evidence from which a jury could conclude the individual acted within the scope of his apparent authority and thus that his fraud could be imputed to the insurer. Id. at 351, 257 S.E.2d at 876.

15

In Dudley, the insurer had done more to clothe its agent with authority than JHLIC is alleged to have done here. For example, the insurer in Dudley had provided the purported agent with a company business card, he was presented in company brochures as an officer, and he was permitted to display written contracts that carried the signature of the president of the company. Id.; see also Schriefer v. Stewart, 892 F.2d 1041, 1989 WL 156878, at *16-17 (4th Cir. 1989) (unpublished table decision) (general principles of agency allow a principal to be held "liable in tort to a third party for his agent's fraudulent misrepresentations, and in contract for his agent's contractual transactions, when the agent's transactional conduct is either actually or apparently authorized by the principal, or is within the agent's inherent agency power.") (citing Restatement (Second) of Agency, § 257, comment a (as to misrepresentations) and id. §§ 140, 145, 159 (as to contract)). To be sure, the complaint here does not allege the same level of acts or words by JHLIC as was presented in Dudley, but that is a distinction of degree. In this case, the complaint sufficiently alleges that Winterrowd acted as a sub-agent of JHLIC's appointed agent in Virginia, that Cook was able to obtain an insurance policy through Winterrowd, with Winterrowd's employer or company listed as the issuing agent on the policy, and that Cook sent premiums to Winterrowd which were accepted by JHLIC.

After discovery, the facts may bear out that Winterrowd was not JHLIC's agent, but at this stage of the case, plaintiffs have alleged sufficient facts to render it plausible. See Royal Indem. Co., 155 Va. at 968, 157 S.E. at 418 ("One who deals with an agent and has no knowledge of any limitations upon his power may deal upon the faith of his ostensible powers, whether this agency be general or special.") (quoting Home Beneficial Ass'n v. Clark, 152 Va. 715[, 721], 148 S.E. 811[, 814] (1929)); Dudley, 220 Va. at 349-50, 257 S.E.2d at 875 (a principal can be held liable for its agent's fraudulent acts where the agent is apparently acting within his authority even if the principal "is entirely innocent, has received no benefit from the transaction [and] . . . although the agent acted

16

solely for his own purposes"); see also Neff Trailer Sales, Inc. v. Dellinger, 221 Va. 367, 370-71, 269 S.E.2d 386, 388 (1980) (whether or not an agent was acting within the apparent scope of his authority was a question of fact for the jury). For all of the foregoing reasons, JHLIC's motion to dismiss will be denied to the extent that it seeks dismissal on the grounds that there is a lack of agency.

JHLIC also argues that, even if agency had been sufficiently alleged and could be established, certain of plaintiffs' claims fail as a matter of law for independent reasons. Specifically, JHLIC contends that: (1) the securities fraud claims fail because JHLIC's life insurance policy is not a "security" and is not subject to the state or federal securities laws; (2) Virginia does not recognize any cause of action for negligent supervision; (3) the claim for breach of fiduciary duty has no independent basis and must be brought as one for breach of contract; and (4) Virginia law prevents plaintiffs from basing a claim for breach of contract on purported duties outside the terms of the contract itself. See Dkt. No. 13 at 1-2 (summarizing arguments).[10] The court addresses these contentions in turn.

### 3. Federal and State Securities Claims in Count II

JHLIC argues that the securities claims against it in Count II fail because the life insurance policy sold to Cook is not a "security." For support, it points to Va. Code § 13.1-501(A), which is a provision of the Virginia Securities Act directing that the term "security" "shall not apply to any insurance policy . . . or any contract or agreement in relation to and in consequence of any such policy . . . , issued by an insurance company subject to the supervision or control of the

---

[10] JHLIC also contends that plaintiffs may not recover the full $1 million plus sought in the complaint under a conversion theory, since a portion of those amounts was in fact paid to procure insurance coverage. Dkt. No. 13 at 10. This is an issue as to the proper amount of damages and need not be addressed at this stage of the case. Plaintiffs have pled that some of the monies were paid to Winterrowd (as an agent for JHLIC) so that he could make premium payments to JHLIC and that those monies were not devoted to the payment of premiums, nor were they returned or given back to plaintiffs. This is sufficient to plead conversion. See Simmons v. Miller, 261 Va. 561, 582, 544 S.E.2d 666, 679 (2001) (conversion requires a showing of "any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights"). Dismissal of the conversion claim is therefore inappropriate.

Commission's Bureau of Insurance when the form of such policy or contract has been duly filed with the Bureau as now or hereafter required by law . . ."). More simply put, life insurance generally does not constitute a security. See id.

The analysis under the federal securities law is similar. That is, "15 U.S.C. § 77c(a)(8) exempts from the securities regulations any insurance or endowment policy or annuity contract issued by a corporation that is subject to the supervision of the insurance commissioner, bank commissioner, or any agency or offer performing like functions." Prieto v. John Hancock Mut. Life Ins. Co., 1998 WL 241229, at *5 (N.D. Tex. May 5, 1998); see, e.g., Olpin v. Ideal Nat'l Ins. Co., 419 F.2d 1250, 1259-61 (10th Cir. 1969), cert. denied, 397 U.S. 1074 (1970) (life insurance policies are not securities under the Securities Exchange Act of 1933 and thus do not give rise to a cause of action under the anti-fraud provisions of the Securities Exchange Act of 1934); Berent v. Kemper Corp., 780 F. Supp. 431, 441 (E.D. Mich. 1991), aff'd, 973 F.2d 1291 (6th Cir. 1992) (citing Olpin). Even where a contract has a fixed mortality benefit in addition to elements indicative of a securities or investment vehicle, the securities or investment vehicle is nonetheless exempt so long as it meets certain criteria. See Berent, 780 F. Supp. at 440-44; Prieto, 1998 WL 241229, at *5. JHLIC insists that the policy here has no investment component and, in any event, does not meet the criteria to bring it outside the exemption. Dkt. No. 13 at 12-13. In particular, it emphasizes that the JHLIC policy places no investment risk whatsoever on the policy owner and thus is not a security. Id. at 13.

Plaintiffs do not dispute that a life insurance policy is not generally a security, but counter that the life insurance policy was sold to Cook by Winterrowd as part of an investment strategy. That is, Winterrowd sold Cook the policy and expressly told him that it could be sold as a life settlement and then misled Cook into believing that he could make such a sale, including preparing false paperwork for the purported sale. In advising that the policy could later be sold as part of a life settlement, their theory goes, it became a "security." For support, plaintiffs rely on an opinion from

18

Virginia's State Corporation Commission, State Corp. Comm'n v. Roman, Case No. SEC-2006-0004 (attached to Dkt. No. 20 as Ex. A), in which it opined that a type of certain life settlement would be a security. Plaintiffs' attempt to shoehorn their claims of fraud related to the purchase or attempted sale of the JHLIC Policy into securities violations fails as a matter of law. Quite simply, Roman is inapposite and does not support plaintiffs' position here.

In Roman, Virginia's State Corporation Commission determined that an individual sold "securities" when he sold interests in "viatical settlements." SCC v. Roman, Case No. SEC-2006-00044 (also attached as Dkt. No. 20, at Ex. A). "Viatical settlements" are agreements by which a terminally ill person sells his life insurance policy at a discount to a "provider," who then names itself the beneficiary and also pays the premiums. Life Partners, Inc. v. Morrison, 484 F.3d 284, 287 (4th Cir. 2007) ("Morrison").

In Roman, the SCC reasoned that the definition of a "security" included an "investment contract," which is defined, in turn, as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." Dkt. No. 20, Ex. A at 5 (citing Tanner v. State Corp. Comm'n, 265 Va. 148, 154-55, 574 S.E.2d 525 (2003)). Applying the Tanner test to the facts before it, the SCC reasoned that the viatical settlements at issue there met the "common enterprise" requirement and that they were securities. Id. at 5-7.

Significantly, the Fourth Circuit's opinion in Morrison strongly suggests that the same result would not obtain on the facts alleged here. The Morrison court has distinguished between different parts of the business of viatical settlements or life settlements and acknowledged that while certain aspects of that business can involve securities, the portion in which the life insurance policyholder sells its policy to a promoter is an insurance transaction, not a securities transaction. Morrison, 484 F. 3d at 300. Specifically, in holding that the Virginia's statute regulating viatical settlements was

19

aimed at the "insurance side" of the viatical settlement business and part of the business of insurance, the Morrison Court distinguished the D.C. Circuit's decision in SEC v. Life Partners, Inc., 87 F.3d 536, 541-42 (D.C. Cir. 1996). According to the Morrison court, the court in SEC v. Life Partners was addressing "'securities' side of a viatical settlement transaction, in which the provider sells interest in the purchased policy or policies to investors" and that aspect of the transaction is to be contrasted with the "insurance side of the viatical transaction—the transaction by which the policyholder sells its policy to a settlement provider." Id. As to that part of the transaction (the only portion at issue here), it is governed by insurance laws and not securities law. See id.

The transactions in Roman, like those in the D.C. Circuit case, were the "security side" of the life settlement business because the provider was selling interests in life insurance policies to investors. The transactions here, by contrast, fall squarely within the "insurance side" of such transactions, in which the policyholder sells its policy to the promoter or settlement provider. See Morrison, 484 F.3d at 300.

Plaintiffs rely solely on Roman and do not cite to any opinion from any court that suggests that the facts alleged here—improper or fraudulent investment advice or actions related to the purchase (and potential future sale) of a single life insurance policy—could give rise to a claim for securities fraud. Moreover, the Morrison decision essentially forecloses such a holding. For these reasons, the court concludes that the securities claims asserted against JHLIC in count II of plaintiffs' complaint should be dismissed.

To the extent the motion also seeks dismissal of the claims of fraud and constructive fraud, the motion is denied. The court concludes that the complaint plausibly alleges both fraud and constructive fraud based on Winterrowd's actions. See Thompson v. Bacon, 245 Va. 107, 111, 425 S.E.2d 512, 514 (1993) ("A party alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to

mislead, (5) reliance by the party misled, and (6) resulting damages to him.") (citation omitted); Economopoulos v. Kolaitis, 259 Va. 806, 813, 528 S.E.2d 714, 719 (2000) (discussing elements of constructive fraud, which are akin to fraud, but may be based on a false representation of a material fact made "innocently or negligently").

### 4. Negligence Claims in Count III

JHLIC next posits that a claim of negligence based on its own conduct (rather than on Winterrowd's conduct as its purported agent) fails for several reasons. First, it claims there is no general duty to supervise employees in Virginia and that Virginia law does not recognize a "negligent supervision" claim. It relies on Chesapeake & Potomac Tel. v. Dowdy, 235 Va. 55, 61, 365 S.E.2d 751, 754 (1988), which held that "[i]n Virginia, there is no duty of reasonable care imposed upon an employer in the supervision of its employees under these circumstances and we will not create one here." The Dowdy case has been cited repeatedly by Virginia circuit courts for the proposition that Virginia does not recognize a tort of negligent supervision. See Hernandez v. Lowe's Home Ctrs., Inc., 83 Va. Cir. 210, 2011 WL 8964944, at *2 (Norfolk Aug. 1, 2011) (citing a number of Virginia circuit court decisions that relied on Dowdy to dismiss negligent supervision claims); see also Morgan v. Wal-Mart Stores E., LP, 2010 WL 4394096, at *4-5 (E.D. Va. Nov. 1, 2010) (declining to "christen" a new cause of action for negligent supervision where the plaintiff did not plead facts that might allow such a claim to proceed); Thompson v. Town of Front Royal, 117 F. Supp. 2d 522, 531 (W.D. Va. 2000) (adopting magistrate judge's determination—to which neither party objected—that Virginia does not recognize a claim for negligent supervision and granting summary judgment on that claim).

Several Virginia circuit courts, however, have interpreted Dowdy's holding as limited to its facts, and have allowed a negligent supervision claim to proceed, at least past the demurrer stage. See, e.g., Hernandez, 2011 WL 8964944, at *3 (citing to other cases and overruling demurrer seeking

21

to dismiss negligent supervision claim). This more recent trend has been also noted by federal courts in the Commonwealth. See Parker v. Wendy's Int'l, Inc., __ F. Supp. 2d __, 2014 WL 4202490, at *4 (E.D. Va. Aug. 22, 2014) (recognizing the split of authority in Virginia trial courts but declining to determine "whether a claim of negligent supervision would ever be cognizable under Virginia law" because the plaintiff before it had failed to plead facts supporting such a claim); Liberty Univ., Inc. v. Citizens Ins. Co. of Am., 16 F. Supp. 3d 636, 664 (W.D. Va. 2014) (discussing Hernandez and the authority cited therein in context of insurance coverage dispute where court did not have to decide the issue of whether Virginia would recognize such a claim).

In light of the limited holding in Dowdy and the more recent authority such as Hernandez, the court is uncertain whether Virginia would recognize such a tort in an appropriate case. It is nonetheless convinced that no such claim has been adequately pled under the facts here. As an initial matter, plaintiffs have pointed to no case in which a negligent supervision claim was applied in the context of an independent contractor relationship, as opposed to an employer-employee relationship. Here, although there is an allegation that Winterrowd was JHLIC's agent for purposes of selling and collecting premiums on the JHLIC policy, plaintiffs do not allege that Winterrowd was JHLIC's employee, as opposed to merely an independent contractor. While the court has concluded that the complaint alleges facts sufficient to establish an agency relationship, see generally supra, a negligent supervision claim requires a legal duty to supervise. While Virginia courts look to four factors in determining whether someone is an employee or independent contractor, the paramount issue is one of the purported employer's "control" over the individual. See Creative Designs Tattooing Assocs., Inc. v. Estate of Parrish, 56 Va. App. 299, 308-10, 693 S.E.2d 303, 310-311 (2010). Specifically the employer's "power to control and direct the servants in the performance of their work" is what distinguishes an employee from an independent contractor. Id. at 308, 693 S.E.2d at 308. Thus, the very nature of an independent contractor suggests the lack of any duty to

22

supervise.

In short, plaintiffs have not identified a case in which a failure to supervise an independent contractor has been held sufficient to support a negligent supervision claim. In the absence of any authority from the Supreme Court of Virginia recognizing such a claim at all, let alone in the context of a relationship which is premised on a lack of control, the court declines to first "christen" the claim here. Cf. Morgan, 2010 WL 4394096, at *4-5. Accordingly, the court will grant JHLIC's motion to dismiss the negligent supervision claim.

Plaintiffs further counter that aside from any negligent supervision claim, the portion of Count III asserting simple negligence directly against JHLIC could be based on a number of Virginia insurance statutes and cites to two—Va. Code §§ 38.2-502 and 38.2-1813(A). According to plaintiffs, these statutes create additional duties and thus that its negligence claim may be premised on a failure to comply with those duties. The court disagrees.

Plaintiffs may not rely on the duties set forth in the insurance statutes because those statutes do not create a private right of action. See, e.g., A & E Supply Co. v. Nationwide Mut. Fire Ins. Co., 798 F.2d 669, 674 (4th Cir. 1986) ("It is clear that the Virginia Supreme Court would not read the Unfair Insurance Practices Act to create a private right of action in tort."); see also Ambrose v. Blue Cross & Blue Shield of Va., Inc., 891 F. Supp. 1153, 1161 (E.D. Va. 1995) (same). Thus, they do not form the basis for a negligence claim.

For these reasons, the court will grant JHLIC's motion to dismiss the claims against it in Count III insofar as they are premised on any direct actions or omissions by JHLIC. The court will deny the motion as to those claims in which plaintiffs seek to hold JHLIC's vicariously liable as a result of Winterrowd's alleged negligence while acting as JHLIC's agent.[11]

---

[11] The court is aware of the authority stating that an employer generally cannot be held liable for physical harm that results from the torts of an independent contractor. McDonald v. Hampton Training Sch. for Nurses, 254 Va. 79, 81, 486 S.E.2d 299, 300-01 (1997) (noting same in discussing whether a hospital could be held vicariously liable for the

Case 7:12-cv-00455-EKD-RSB   Document 58   Filed 01/14/15   Page 23 of 39   Pageid#: 599

**5. Claim for Breach of Fiduciary Duty in Count IV**

Count IV asserts a breach of fiduciary duty claim against the defendants. To succeed on this claim, plaintiffs must establish the existence of a duty, a breach of that duty, and damages proximately caused by the breach of that duty. See Carstensen v. Chrisland Corp., 247 Va. 433, 443-44, 442 S.E.2d 660, 666 (1994). JHLIC contends that plaintiffs cannot establish this claim against it because the only duty owed is governed by the contract, and is not a common law duty. It thus posits that there can be no independent claim for breach of a fiduciary duty. Essentially, it relies on the economic loss rule, which states that a duty which arises solely by virtue of a contract does not give rise to an independent claim in tort. See Augusta Mut. Ins. Co. v. Mason, 274 Va. 199, 205, 645 S.E.2d 290, 293-94 (2007).

A fiduciary duty, however, can exist independently of contract. See Hamby v. St. Paul Mercury Indem. Co., 217 F.2d 78, 80 (4th Cir. 1954) ("The [fiduciary] relation arises whenever the property of one person is placed in charge of another."); see Cincinnati Ins. Co. v. Ruch, 940 F. Supp. 2d 338, 346 (E.D. Va. 2013) (economic loss rule did not bar breach of fiduciary duty claim against insurance broker because duty could exist outside of contract). Applying the logic of Hamby and Ruch to the facts alleged here, then, the duties owed by a fiduciary relationship could exist because Winterrowd (acting as an agent for JHLIC) held property (the JHLIC premiums) for Cook. Both that duty, as well as a duty to not misrepresent facts concerning insurance policies in their sale, exist regardless of the contract, and thus the court concludes that the economic loss rule does not

---

torts of a physician who performed services there). But the actions of an independent contractor who is also an agent (sometimes called a "nonservant agent") can result in liability for the principal so long as those acts are committed within the scope of the agent's apparent or actual authority. See generally Douglas R. Richmond, Liability Issues in the Sale of Life Insurance, 40 Tort Trial & Ins. Practice Law J. 877, 886-87 (2005). The Virginia Supreme Court recognized this in Dudley, as well: "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud. Restatement (Second) of Agency § 261." Dudley, 220 Va. at 350, 257 S.E.2d at 875; see also Travelers Prop. Cas. Co. of Am. v. Liberty Mut. Ins. Co., 444 F.3d 217, 223 (4th Cir. 2006) (applying Maryland law and general principles of agency to conclude that where an individual was an agent for a corporation for certain purposes, tort liability of the corporation could be founded on the agent's actions, regardless of whether the individual was an employee or an independent contractor).

Case 7:12-cv-00455-EKD-RSB   Document 58   Filed 01/14/15   Page 24 of 39   Pageid#: 600

bar the claim here. Cf. Abi-Najm v. Concord Condo., LLC, 280 Va. 350, 361, 699 S.E.2d 483, 489 (2010) (holding that where the source of the duty allegedly violated was a supplier's duty under the Virginia Consumer Protection Act not to misrepresent its goods, that duty existed independent of the contracts entered into between the parties and thus the claim was not barred by the economic loss rule).

Furthermore, as relevant here, Virginia law recognizes that an insurance broker (if Winterrowd were considered as such) can be an agent for both the insured and for the insurer for certain purposes. Harris v. K&K Ins. Agency, Inc., 249 Va. 157, 161, 453 S.E.2d 284, 286 (1995) (citing Pacific Fire Ins. Co. v. Bowers, 163 Va. 349, 175 S.E. 763, 765 (1934)) ("Although a broker is an agent for the insured, he also may be, at the same time, an agent for the insurer for certain purposes."). Virginia law further recognizes that, with an agency relationship, a fiduciary relationship can arise. See Cincinnati Ins. Co. v. Ruch, 940 F. Supp. 2d 338, 347 (E.D. Va. 2013) (declining to dismiss claim brought by assignee of insured against broker who was to procure insurance and failed to do so and noting that "[a]n insured may sue a broker for breach of fiduciary duty.  Once an agency relationship between an insured and a broker is established, a fiduciary relationship generally arises as a matter of law.") (citations omitted); H-B Ltd. P'ship v. Wimmer, 220 Va. 176, 179, 257 S.E.2d 770, 773 (1979) ("An agent is a fiduciary with respect to the matters within the scope of his agency.").  As the court has already noted, discovery is needed to better flesh out the agency relationships, if any, between Winterrowd and the various parties.  Based on the foregoing authorities, however, the complaint states a plausible claim of breach of a fiduciary duty and thus dismissal of Count IV is not warranted at this time.

### 6. Breach of Contract Claim in Count V

As to the breach of contract claim, JHLIC argues first that Cook is not a party to the JHLIC contract (which is owned by the Trust) and thus cannot bring a breach of contract claim. The court

agrees. Thus, to the extent Cook's breach of contract claim against JHLIC is premised on breaches of the written JHLIC Policy itself, it fails as a matter of law.

JHLIC also contends, though, that the breaches alleged by plaintiffs against it are not set forth in the contract itself, and thus there can be no breach of contract claim against JHLIC at all. The three elements required to establish breach of contract under Virginia law are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Ulloa v. QSP, Inc., 271 Va. 72, 79, 624 S.E.2d 43, 48 (2006) (citation omitted).

In their response, plaintiffs explain that their breach of contract claim relates not to a breach of any terms of the JHLIC policy itself, but to a breach of the oral agreement between JHLIC (again, made through its agent Winterrowd) and Cook that the $10 million life insurance policy would be sold within two years at a profit. Plaintiffs assert that the document prepared by Winterrowd and/or Yurkus that explicitly refers to the "JH" policy and a sales price after two years is evidence of this agreement. They further argue that the parties partially performed by "Plaintiffs purchasing the insurance and John Hancock issuing the insurance" but that a breach occurred when "[t]he promised sale as a life settlement failed to occur." Dkt. No. 20 at 16.

The particulars underlying this purported oral contract ultimately may find no support in facts adduced during discovery. Moreover, as with other alleged actions by Winterrowd, it is not clear what precise role he was playing or whose agent he was at the time he entered into the purported agreement. But the complaint alleges that there was an oral contract between plaintiffs and JHLIC, made via its agent Winterrowd, and that the contract was breached, causing Cook damages. At this stage, the court concludes the complaint alleges sufficient facts to establish a breach of contract and thus will deny the motion to dismiss the breach of contract claim.

26

## B. Nationwide's Motion to Dismiss

### 1. Claims by the Trust/Trustee

The court turns next to the motion to dismiss by Nationwide. As a preliminary matter, Nationwide argues (albeit only in a footnote) that there can be no viable claims by the Trust against it because it had no relationship or connection to the Trust. Dkt. No. 18 at 8 n.6. Instead, the claims against it involve only the Nationwide annuity owned by Cook, and the Trust has no relation to the annuity at all. The court agrees that the allegations in the complaint do not state any claim by the Trust or Trustee against Nationwide and thus any claims intended to be asserted by the Trustee against Nationwide will be dismissed. The discussion below, therefore, applies only to Cook's claims against Nationwide.

### 2. Agency

Nationwide argues that Winterrowd was not its agent for purposes of either making the $150,000 withdrawal or re-submitting the withdrawn funds. Dkt. No. 18 at 21-22; Dkt. No. 24 at 3. Because these are the only actions allegedly giving rise to its liability, it thus contends that it cannot be held vicariously liable for Winterrowd's conduct. Its argument that the complaint does not adequately allege agency is based on several reasons. None of them persuade the court, however, that it should dismiss all claims.

Nationwide first argues that it cannot be held vicariously liable for Winterrowd's actions because Winterrowd is at best an "independent contractor," rather than an employee. Dkt. No. 18 at 21 (citing McDonald v. Hampton Training Sch. for Nurses, 254 Va. 79, 81, 486 S.E.2d 299, 300-01 (1997)). This is an incomplete statement of the law as applied in this context. As discussed above, see supra note 11, when an individual is acting as an agent for another (regardless of whether he is an employee or an independent contractor), the principal can be held liable for the agent's acts that are within the scope of his actual or apparent authority. Dudley, 220 Va. at 350, 257 S.E.2d at 875

27

("A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud. Restatement (Second) of Agency § 261."); Travelers Prop. Cas. Co. of Am., 444 F.3d at 223.

Thus, if Cook has alleged sufficient facts to establish Winterrowd acted within the scope of his actual agency and apparent authority, Nationwide is not entitled to dismissal on this ground. Sanchez v. Medicorp Health Sys., 270 Va. 299, 303-04 & n.4, 618 S.E.2d 331, 333 & n.4 (2005) ("Apparent authority" is a concept distinct from "apparent agency" and refers to the authority "that a third party reasonably believes an agent has, based on the third party's dealings with the principal, even though the principal did not confer or intend to confer the authority.") (quoting Black's Law Dictionary 142 (8th ed. 2004)). This term "presupposes the existence of an agency relationship" and allows "the mutual rights and liabilities" between the principal and third persons to be governed by the scope of the "apparent authority," which is "that authority which the principal has held the agent out as possessing, or which he has permitted the agent to represent that he possesses." Id. at 304, 618 S.E.2d at 333 (citations omitted).

Nationwide asserts that the complaint does not contain allegations showing that it took any actions to clothe Winterrowd with apparent authority and thus, that any claims based on agency fail as a matter of law. Instead, Nationwide argues that "undisputed facts conclusively establish" that Winterrowd was acting as a financial advisor to Cook when he committed the fraud complained of (as to Nationwide) and not as an agent for Nationwide.

Discovery may prove Nationwide's theory correct. But in ruling on a motion to dismiss, the court must take the allegations of the complaint as true. The complaint in this case alleges that that Winterrowd was Nationwide's appointed agent in Virginia at the time he sold the annuity to Cook and at the time he submitted the forged withdrawal form, received back the funds from Cook, and

then failed to return them to the annuity. Dkt. No. 1 at ¶ 24 (alleging that both at the time of sale and at the time Winterrowd withdrew the $150,000 from the Nationwide Annuity, he "was appointed as an agent and producer for Nationwide . . . in Virginia"). In addition to being an appointed agent in Virginia, Winterrowd at least had access to the blank forms to allow him to effect a withdrawal (albeit with a forged signature of the client). While this is not a lot to establish actual agency or apparent authority, the court notes that agency is generally a question of fact for the jury, Neff Trailer Sales, Inc., 221 Va. at 370-71, 269 S.E.2d at 388 (whether or not an agent was acting within the apparent scope of his authority was a question of fact for the jury). The court thus concludes dismissal on this ground would be inappropriate. In short, the court concludes that the complaint contains sufficient allegations to plausibly show agency and "apparent authority."[12]

Nationwide further asserts a number of arguments (similar in kind to its causation arguments, addressed below) as to why it was not reasonable for Cook to believe that Winterrowd was Nationwide's agent with authority to reverse a withdrawal. See Dkt. No. 24 at 7-9. Nationwide correctly notes that in order for the acts taken by an agent to be within the scope of an agent's apparent authority, the third party's belief that the agent had the authority to act must be reasonable. Restatement (Third) of Agency § 2.03. In support of its contention that any such belief here was not reasonable, it points out that Cook knew he had not authorized the withdrawal form to be signed or submitted and thus that, as soon as he learned of the unauthorized withdrawal, it was not reasonable of him to believe that Winterrowd had the authority as an agent of Nationwide to reverse the transaction. Much like Nationwide's causation arguments, discussed infra, discovery may ultimately

---

[12] Nationwide also contends that the actions Winterrowd took that plaintiffs wish to impute to Nationwide do not fall within the within the scope of Va. Code Ann. § 38.2-1801 and thus that any agency relationship cannot be premised on that statute. Dkt. No. 24 at 10-16. Cook contends that the returned funds should be considered a premium under subsection (B) of that statute, while Nationwide claims it was not a "premium" and thus that the statute is wholly inapplicable. Id. at 10 (citing Early Settlers Ins. Co. v. Lay, 19 Va. Cir. 125, 127, 1990 WL 751427, at *2 (Fairfax County 1990)). Because the court concludes that the complaint's allegations of actual agency and apparent authority are sufficient to establish plausible agency, it need not resolve this issue.

Case 7:12-cv-00455-EKD-RSB   Document 58   Filed 01/14/15   Page 29 of 39   Pageid#: 605

support Nationwide's argument. But accepting all the facts as true and in light of the fact that reasonableness is generally a fact question, dismissal on this ground is not appropriate. See infra at 30-31; see also Sheltry v. Unum Life Ins. Co. of Am., 247 F. Supp. 2d 169, 176-77 (D. Conn. 2004) (finding there were disputes of fact as to whether independent insurance broker who sold insurance for thirteen different insurers had actual or apparent authority to act on insurer's behalf, where he accepted insurance application from plaintiffs, and took their payment of premiums, but then stole the premiums).

### 3. Causation

Nationwide next contends that all of Cook's claims fail for the independent reason that he has not adequately pled it was Nationwide's conduct (or its agents) that caused his loss. In particular, Nationwide points out that it sent the funds to Cook in response to Winterrowd allegedly submitting the fraudulent withdrawal form, and that it was Cook who sent them to Winterrowd, thereby creating the opportunity for the theft. Specifically, the complaint alleges that after he received the funds, Cook called Winterrowd and informed him that he did not want funds withdrawn from his Nationwide annuity, and Cook instructed Winterrowd to put the funds back. But instead of wiring the funds directly to Nationwide (or contacting Nationwide directly at all to address the problem), Cook instead wired them to an account owned by Winterrowd. Winterrowd then took the money and did not put it back in the annuity. Nationwide posits that the Cook's intervening act of wiring his money to Winterrowd is the direct and proximate cause of his loss.

Nationwide also argues that the facts alleged in the complaint include a number of red flags that should have alerted Cook to Winterrowd's malfeasance. Cook ignored these red flags and did not tell Nationwide about the problems or give Nationwide any opportunity to correct them. Nationwide also points to language in the Policy itself that states that no one other than the owner should be permitted to make a withdrawal, and thus that Cook should have known that Winterrowd

30

was acting improperly in authorizing the withdrawal. Basically, Nationwide claims that Cook's contributory negligence bars his tort claims and as to the contract claim, the facts as alleged do not establish that Nationwide breached the annuity contract or that the breach caused Cook's damages.

In response to Nationwide's arguments concerning a lack of causation, Cook points out that the only person he had any interactions with concerning the Nationwide annuity was Winterrowd. Cook had purchased the annuity from Winterrowd and he inquired about the withdrawal with Winterrowd. When he learned that the withdrawal had been made, he claims it was reasonable for him to have contacted Winterrowd and to follow his instructions, given his status as an appointed agent for Nationwide. See, e.g., Craig, 213 Va. at 663, 194 S.E.2d at 732 (relying on fact that the agent "was the only individual with whom [the insureds] had any contact regarding the issuance of the fire insurance policy" in finding potential agency relationship because "[o]ne who deals with an agent and has no knowledge of any limitations upon his power may deal upon the faith of his ostensible powers, whether this agency be general or special") (quoting Royal Indem. Co., 155 Va. at 68, 157 S.E. at 418).

Whether or not Cook ultimately will be able to prove causation is not before the court. Facts adduced in discovery might allow a factfinder to find that Cook was too trusting of Winterrowd and acted unreasonably or carelessly in returning the funds from the unauthorized withdrawal to Winterrowd directly and thus that his own conduct caused his loss. It is generally inappropriate, however, to resolve questions about causation and contributory negligence at the motion to dismiss stage. See, e.g., King v. Aaron Smith Trucking Co., Inc., 60 F.3d 823, 1995 WL 381810, at *4 (4th Cir. June 28, 1995) (unpublished table decision) (citing to a number of Supreme Court of Virginia cases and summarizing that "it is rare that proximate causation can be decided as a matter of law"). Cook is required to state a claim that is "plausible on its face" and the court concludes that he has alleged facts from which a jury could find both that he acted reasonably and that he was neither an

31

intervening cause nor the sole cause of the losses he sustained. Accordingly, the motion to dismiss on this ground will be denied.

### 4. Claim for Conversion in Count I

Nationwide contends that the conversion claim in Count I is barred by the economic loss doctrine, but the court concludes that the economic loss doctrine does not bar such a claim. Virginia courts routinely have held that the duty not to convert others' property is a common law duty owed by all, and would exist even in the absence of a contract between the parties. Thus, the doctrine does not bar the conversion claim. PGI, Inc. v. Rathe Prods., Inc., 265 Va. 334, 344, 576 S.E.2d 438, 443 (2003) ("A cause of action for conversion lies independent of an action in contract and may provide a separate basis [for suit], distinct from the contract . . ."); Hewlette v. Hovis, 318 F. Supp. 2d 332, 337 (E.D. Va. 2004) (relying on same to conclude that claims for fraud and conversion were independent, wilful torts under Virginia law and not barred by the economic loss doctrine).

In addition to arguing that the conversion claim is barred by the economic loss doctrine, Nationwide also contends that Cook cannot maintain a claim for conversion since he alone exercised control over his property. Cf. Simmons, 261 Va. at 582, 544 S.E.2d at 679 (conversion requires that the defendant wrongfully exerted dominion "over property in denial of, or inconsistent with, the owner's rights"). The court disagrees. If Winterrowd was acting as Nationwide's agent when he received the monies from Cook and failed to return them to the annuity as requested, that would suffice to establish a conversion claim against Nationwide. The motion to dismiss the conversion claim will therefore be denied.

### 5. Fraud Claims in Count II

Nationwide makes a variety of arguments in its supporting brief as to why the fraud claims against it should be dismissed, including that they arise out of allegations that have nothing to do with Nationwide, that any misrepresentations are not pleaded with particularity, that the securities

fraud claims require "heightened pleading requirements" that have not been met, and that (presumably aside from Winterrowd's statements and actions), there are no allegations that Nationwide made any affirmative misrepresentations or fraudulent omissions. As to the state and federal securities fraud claims, it further argues that these are not actionable because the alleged misrepresentation did not arise in the context of the sale or purchase of a security or in the confines of an investment advisory relationship as required. Dkt. No. 18 at 16 & n. 10.

In his response, Cook points to paragraphs 24 through 28 of the complaint as containing the specific allegations underlying the fraud claim. The court has carefully reviewed those allegations and concludes that, to the extent Winterrowd was acting as Nationwide's agent in taking the challenged actions, Cook's common law fraud and constructive fraud claims have been adequately and sufficiently pled. See Thompson, 245 Va. at 111, 425 S.E.2d at 514 (listing elements of fraud claim); Economopoulos, 259 Va. at 813, 528 S.E.2d at 719 (discussing elements of constructive fraud); see also supra at 20-21.

As to the state and federal securities fraud claims, Nationwide correctly notes that Cook must meet a heightened pleading requirement. See Matrix Capital Mgmt. Fund, LP v. Bearing Point, Inc., 576 F.3d 172, 181 (4th Cir. 2009) (a plaintiff making a private securities fraud claim under the Private Securities Litigation Reform Act of 1995 ('PSLRA') must meet a heightened pleading standard and typically prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation") (citations omitted). The Virginia Securities Law claim is similar, albeit not identical. See Dunn v. Borta, 369 F.3d 421, 432-33 (4th Cir. 2004) (holding that a claim under Va. Code § 13.1-522(A) does not include the elements of reliance or causation); Diaz Vicente v. Obenauer, 736 F. Supp. 679, 693 (E.D. Va. 1990) ("Unlike its federal counterpart, the Virginia Securities Act does not

33

require scienter.").

Unlike the JHLIC life insurance policy, the Nationwide variable annuity itself qualifies as a security, a conclusion that Nationwide does not dispute. See S.E.C. v. Variable Annuity Life Ins. Co. of Am., 359 U.S. 65, 71-73 (1959). The more difficult question is whether the third element of the federal claim (also a requirement in the state act) is satisfied by the allegations here, i.e., whether the misrepresentations occurred "in connection with" the sale or purchase of a security as required to state a violation of the securities laws. It is not clear at first blush that the fraudulent statements relate to the sale or purchase of a security at all; instead, they seem to relate to a specific sum allegedly withdrawn from a variable annuity account without authorization and then stolen. The false statements involved both the forged signature on the withdrawal form and Winterrowd's subsequent and repeated false statements that the monies would be (or had been) returned or refunded.

Cook does not disagree that a securities fraud claim must arise in the context of the sale or purchase of security or in the confines of an investment relationship. See Dkt. No. 18 at 17 & nn. 9-10. He argues, though, that when a withdrawal from an annuity is made, it requires selling from various sub-accounts, "thereby invoking the protections of the securities laws which cover the purchase and sale of securities." Dkt. No. 21 at 111.

On this issue (and despite the fact that neither party cites to the case), the court finds the reasoning of S.E.C. v. Zandford, 535 U.S. 813 (2002), persuasive. In Zandford, the Supreme Court held that the broker's alleged conduct of selling customers' securities with the undisclosed intent to misappropriate the proceeds constituted fraud "in connection with the purchase or sale of any security." Id. at 825. There, a broker hired by investors to manage their investment account allegedly engaged in a fraudulent scheme to misappropriate the money and use it for his personal purposes. Id. at 815. In a number of the challenged transactions, he wrote "checks to himself from a mutual fund account held by the [investors], which required liquidating securities in order to redeem the

34

checks." Id. at 816.

The district court in the case had granted summary judgment in favor of respondent, but the Fourth Circuit reversed and remanded with instructions to dismiss the complaint. Id. The Fourth Circuit reasoned the sales of the securities were merely incidental to a fraud that "lay in absconding with the proceeds" of sales conducted in a routine way and that the broker's "scheme was simply to steal" the investors' assets. 535 U.S. at 617 (quoting Fourth Circuit ruling, S.E.C. v. Zandford, 238 F.3d 559 (2001)). The Fourth Circuit "refused 'to stretch the language of the securities fraud provisions to encompass every conversion or theft that happens to involve securities.'" Id. (quoting 238 F.3d at 566). The Supreme Court reversed, concluding that these allegations were sufficient (for purposes of a motion to dismiss) to plead a federal securities fraud claim. Id. at 825.

The same is true of the alleged facts here. When Winterrowd told Cook to send him the money so that he could reverse the withdrawal (or essentially reinvest it in his annuity) but did so with the alleged intention of stealing those funds, he made a material misrepresentation in connection with the purchase of a security. Cook has pleaded enough and the court will not dismiss any of the claims in count II.

### 6. Economic Loss Doctrine and Negligence Claim in Count III

Nationwide next argues that the rights and obligations of the parties pertaining to the withdrawal of funds from the annuity are governed by the contract, and thus that plaintiffs' negligence claim (and other tort-based claims) are barred by the economic loss doctrine. Moreover, the only possible allegations of direct negligence against Nationwide (as opposed to one based on liability for Winterrowd's acts) are that: (1) Nationwide was negligent in allowing the withdrawal; (2) Nationwide was negligent in failing to supervise Winterrowd; and (3) additional duties were owed to Cook by Nationwide under Virginia insurance statues. See, e.g., Dkt. No. 1 at ¶ 36 (alleging Nationwide "failed to set up sufficient compliance procedures to investigate clear red flags such as

35

the modified and forged withdrawal form[]"). Nationwide contends none of these sufficiently plead a cause of action.

As to the first allegation, any duty owed to Cook to not allow the withdrawal arises only because of the contractual relationship between Cook and Nationwide. Accordingly, the court concludes that this claim is one that is barred by the economic loss rule in Virginia. That rule prohibits a plaintiff from characterizing a breach of contract claim as a tort claim. Where, as here, the only duty allegedly breached is one that exists only by virtue of the existence of a contract between the parties, no viable tort claim arises. See Augusta Mut. Ins. Co., 274 Va. at 205, 645 S.E.2d at 293-94 (a duty which arises solely by virtue of a contract does not give rise to an independent claim in tort); See Filak v. George, 267 Va. 612, 618, 594 S.E.2d 610, 613 (2004) (citing Sensenbrenner v. Rust, Orling & Neale, Architects, Inc., 236 Va. 419, 425, 374 S.E.2d 55, 58 (1988) ("[L]osses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of the law of contracts."). Thus, the court will grant Nationwide's claim to dismiss any claim of negligence against it based on allowing the unauthorized withdrawal.

Additionally, for the same reasons set forth above in addressing the negligence claim against JHLIC, see supra at 21-23, the court concludes that the remaining alleged acts of negligence cannot result in liability to Nationwide. Specifically, the tort of negligent supervision is not available in this context, and the insurance statutes relied upon by Cook do not create private causes of action. Accordingly, any negligence claim premised on the direct negligence of Nationwide fails as a matter of law and the court will dismiss such claims against Nationwide.

### 7. Breach of Fiduciary Duty in Count IV

Nationwide seeks dismissal of the breach of fiduciary duty claim in Count IV because "it is well-settled under Virginia law that no fiduciary relationship exists between an insurance company

Case 7:12-cv-00455-EKD-RSB   Document 58   Filed 01/14/15   Page 36 of 39   Pageid#: 612

and its customer." Dkt. No. 18 at 21 (citing State Farm Mut. Auto. Ins. Co. v. Floyd, 235 Va. 136, 143, 366 S.E.2d 93, 96 (1988) (in context of whether or not to settle a claim under a policy, insurer owed no fiduciary duties to its insured)). Cook appears to be arguing that a fiduciary relationship was created between him and Nationwide by virtue of him returning the funds to Winterrowd (as agent of Nationwide). See Dkt. No. 21 at 12-13 (quoting, in particular, Hamby v. St. Paul Mercury Indem. Co., 217 F.2d 78, 80 (4th Cir. 1954) for the proposition that "[t]he [fiduciary] relation arises whenever the property of one person is placed in charge of another").

For similar reasons as discussed by the court above with regard to the breach of fiduciary claim against JHLIC, the motion to dismiss the breach of fiduciary claim against Nationwide will be denied. See supra at 24-25 (discussing same as to breach of fiduciary duty claim against JHLIC). In particular, plaintiff has adequately alleged that a fiduciary duty was owed to Cook by Winterrowd and have pleaded additional facts that Winterrowd was acting as Nationwide's agent when he breached that duty, causing damages.

### 8. Breach of Contract Claim in Count V

In order to establish his breach of contract claim against Nationwide, Cook must establish "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Ulloa, 271 Va. at 79, 624 S.E.2d at 48. Cook points to the following contractual duties as having been breached by Nationwide, the first two of which are set forth in the annuity contract, and the third of which Cook characterizes as an "implied contract": (1) "to only distribute funds from his variable annuity when explicitly authorized by him," (2) "to properly account for premiums paid through its agent," and (3) to "not allow its agent to wrongfully convert and steal his funds." Dkt. No. 1 at ¶ 62.

The court concludes that Cook has adequately pleaded a breach of contract claim, at the very

least one based on an alleged breach of the first contractual obligation above. The complaint alleges that Nationwide had a contractual duty to Cook to allow the withdrawal of funds from his Annuity only with his express approval. Although Nationwide makes some arguments to the contrary, the court concludes that the complaint adequately pleads the first two elements of a breach of contract claim, i.e., that Nationwide breached the contract by allowing the withdrawal based on a fraudulent form and where the withdrawal was not authorized by Cook. Additionally, for the reasons discussed above concerning causation generally, the court concludes that Cook has made a plausible claim that Nationwide's alleged breach caused his losses. Thus, the court will deny the motion to dismiss the contract claim.

## IV.

For the foregoing reasons, JHLIC's Motion to Dismiss, Dkt. No. 12 will be **GRANTED IN PART** and **DENIED IN PART**. The following claims against JHLIC will be **DISMISSED with prejudice**:

> 1. those claims in Count II alleging violations of the state and federal securities laws;

> 2. the negligent supervision claim and claims based on the direct negligence of JHLIC in Count III; and

> 3. the breach of contract claim in Count V, insofar as it is brought by Cook and alleges a breach of the terms of the JHLIC Policy.

It will be **DENIED** in all other respects, which means that the following claims survive:

> 1. the conversion claim in Count I;

> 2. the common law fraud and constructive fraud claims in Count II;

> 3. the negligence claims in Count III where JHLIC's liability is premised on the actions of Winterrowd as its agent;

> 4. the breach of fiduciary duty claim in Count IV; and

> 5. the breach of contract claim in Count V premised on breach of an alleged oral contract.

Nationwide's Motion to Dismiss, Dkt. No. 18, likewise will be **GRANTED IN PART** and **DENIED IN PART**. The following claims against Nationwide will be **DISMISSED with prejudice**:

1. all the claims against it brought by the Trust or Trustee; and

2. the negligent supervision claim and claims based on the direct negligence of Nationwide in Count III.

It will be **DENIED** in all other respects, which means that the following claims brought by I. Kenneth Cook survive:

1. the conversion claim in Count I;

2. all of the fraud claims in Count II;

3. the negligence claims in Count III where Nationwide's liability is premised on the actions of Winterrowd as its agent;

4. the breach of fiduciary duty claim in Count IV; and

5. the breach of contract claim in Count V.

The court will also order that two amendments be made to the complaint and style of the case. Specifically, the court will order:

1. that the name of the second plaintiff be amended to "Kenneth Todd Cook, Trustee of the Kenneth Cook Irrevocable Insurance Trust"; and

2. that the first defendant's name be amended to "John Hancock Life Insurance Company (U.S.A.)."

An appropriate Order will be entered.

Entered: January 14, 2015

*Michael F. Urbanski*

Michael F. Urbanski
United States District Judge

Case 7:12-cv-00455-EKD-RSB   Document 58   Filed 01/14/15   Page 39 of 39   Pageid#: 615